**LeClairRyan**
*A Professional Corporation*
One Riverfront Plaza
1037 Raymond Boulevard
Newark, New Jersey 07102
(973) 491-3600
Attorneys for Plaintiff, Travelodge Hotels, Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| TRAVELODGE HOTELS, INC., a Delaware Corporation, | : |
| Plaintiff, | :     Civil Action No. 16- |
| v. | : |
|  | :     **COMPLAINT** |
| VIPOO HOSPITALITY, INC., a Texas Corporation; and VINOD SHAH, an individual, | : |
| Defendants. | : |
|  | : |

Plaintiff Travelodge Hotels, Inc., by its attorneys, LeClairRyan, complaining of defendants, Vipoo Hospitality, Inc. and Vinod Shah, says:

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Travelodge Hotels, Inc. ("THI") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.

2.      Defendant Vipoo Hospitality, Inc. ("Vipoo"), on information and belief, is a corporation organized and existing under the laws of the State of Texas, with its principal place of business at 6200 Savoy # 550, Houston, Texas 77036.

3.      Defendant Vinod Shah ("Shah"), on information and belief, is a principal of Vipoo and a citizen of the State of Texas, having an address at 6200 Savoy # 550, Houston, Texas 77036.

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 inasmuch as the plaintiff and both defendants are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

5.      This Court has personal jurisdiction over Vipoo by virtue of, among other things, section 17.6.3 of the August 28, 2008 franchise agreement by and between Vipoo and THI (the "Franchise Agreement"), described in more detail below, pursuant to which Vipoo has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

6.      This Court has personal jurisdiction over Shah by virtue of, among other things, the terms of a Guaranty (the "Guaranty"), described in more detail below, pursuant to which Shah acknowledged that he was personally bound by section 17 of the Franchise Agreement.

7.      Venue is proper in this District pursuant to section 17.6.3 of the Franchise Agreement, inasmuch as that provision contains an express waiver by Vipoo of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Agreements Between The Parties

8.      On or about August 28, 2008, THI entered into the Franchise Agreement with Vipoo for the operation of a 164-room[1] Travelodge® guest lodging facility located at 910 Corn Products Road, Corpus Christie, Texas 78409, designated as Site No. 09426-77467-03 (the "Facility").  A true copy of the Franchise Agreement is attached hereto as Exhibit A.

9.      Pursuant to section 5 of the Franchise Agreement, Vipoo was obligated to operate a Travelodge® guest lodging facility for a fifteen-year term.

10.      Pursuant to section 7 and Schedule C of the Franchise Agreement, Vipoo was required to make certain periodic payments to THI for royalties, system assessment fees, taxes, interest, reservation system user fees, and other fees (collectively, "Recurring Fees").

11.      Pursuant to section 7.3 of the Franchise Agreement, Vipoo agreed that interest is payable "on any past due amount payable to [THI] under this [Franchise] Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

12.      Pursuant to section 3.6 of the Franchise Agreement, Vipoo was required to prepare and submit monthly reports to THI disclosing, among other things, the amount of gross room revenue earned by Vipoo at the Facility in the preceding month for purposes of establishing the amount of royalties and other Recurring Fees due to THI.

13.      Pursuant to section 3.6 of the Franchise Agreement, Vipoo agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the

---

[1] By amendment dated January 1, 2011 (the "Amendment"), the parties amended Schedule B, Part II of the Franchise Agreement to reflect that the number of guest rooms at the Facility had increased from 164 rooms to 240 rooms.  A true copy of the Amendment is attached hereto as Exhibit B.

3

gross room revenue of the Facility and, pursuant to sections 3.6 and  4.8 of  the Franchise

Agreement, Vipoo agreed to allow THI to examine, audit, and make copies of the entries in these

books, records, and accounts.

14.     Pursuant to section 11.2 of the Franchise Agreement, THI could terminate the

Franchise Agreement, with notice to Vipoo, if Vipoo (a) discontinued operating the Facility as a

Travelodge® guest lodging establishment; (b) lost possession or the right to possession of the

Facility; and/or (c) was subject to any voluntary or involuntary bankruptcy.

15.     Pursuant to section 12.1 of the Franchise Agreement, Vipoo agreed that, in the

event of a termination of the Franchise Agreement pursuant to section 11.2, it would pay

liquidated damages to THI in accordance with a formula specified in the Franchise Agreement.

16.     Pursuant to section 17.4 of the Franchise Agreement, Vipoo agreed that the non-

prevailing party would "pay all costs and expenses, including reasonable attorneys' fees,

incurred by the prevailing party to enforce this [Franchise] Agreement or collect amounts owed

under this [Franchise] Agreement."

17.     Effective as of the date of the Franchise Agreement, Shah provided THI with a

Guaranty of Vipoo's obligations under the Franchise Agreement.  A true copy of the Guaranty is

attached hereto as Exhibit C.

18.     Pursuant to the terms of the Guaranty, Shah agreed, among other things, that upon

a default under the Franchise Agreement, he would  "immediately make each payment and

perform or cause [Vipoo] to perform, each unpaid or unperformed obligation of [Vipoo] under

the [Franchise] Agreement."

19.     Pursuant to the terms of the Guaranty, Shah agreed to pay the costs, including reasonable attorneys' fees, incurred by THI in enforcing its rights or remedies under the Guaranty or the Franchise Agreement.

## The Termination of the Franchise Agreement

20.     On or around May 6, 2013 Vipoo filed a voluntary Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of Texas under Case No. 13-20208.

21.     On or around March 27, 2014, the United States Bankruptcy Court for the Southern District of Texas (1) authorized the sale of the Facility, and (2) authorized the termination of the Franchise Agreement to occur on the date the Facility was sold.

22.     On or around June 12, 2014, the Facility was sold to a third-party thereby terminating the Franchise Agreement.

23.     By letter dated June 25, 2014, a true copy of which is attached as Exhibit D, THI acknowledged Vipoo's termination of the Franchise Agreement, effective June 12, 2014, and advised that Vipoo that it was (1) indebted to THI for pre-petition Recurring Fees, (2) responsible for liquidated damages in the amount of $480,000.00 as required under the Franchise Agreement, and (3) outstanding Recurring Fees accruing from the date of bankruptcy through the date of termination.

24.     On or around June 30, 2014, the United States Bankruptcy Court for the Southern District of Texas dismissed Vipoo's bankruptcy action.

## FIRST COUNT

25.     THI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 24 of the Complaint.

26.     Pursuant to sections 3.6 and 4.8 of the Franchise Agreement, Vipoo agreed to allow THI to examine, audit, and make copies of Vipoo's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

27.     The calculation of the monetary amounts sought by THI in this action is based on the gross room revenue information supplied to THI by Vipoo and, to the extent there has been non-reporting, THI's estimate as to the gross room revenue earned by Vipoo.

28.     The accuracy of this estimate cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from Vipoo.

**WHEREFORE**, THI demands judgment ordering that Vipoo account to THI for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility from the inception through the date of termination of the Franchise Agreement.

## SECOND COUNT

29.     THI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 28 of the Complaint.

30.     On or around June 12, 2014, the Facility was sold to a third-party thereby terminating the Franchise Agreement.

31.     By letter dated June 25, 2014, THI acknowledged Vipoo's termination of the Franchise Agreement effective June 12, 2014.

32.     Section 12.1 of the Franchise Agreement provides that, in the event of termination of the Franchise Agreement due to action of the Franchisee, Vipoo shall pay liquidated damages to THI within 30 days of termination.

6

33.     As a result of the termination of the Franchise Agreement, Vipoo is obligated to pay THI liquidated damages in the amount of $480,000.00, as calculated pursuant to section 12.1 of the Franchise Agreement.

34.     Notwithstanding THI's demand for payment, Vipoo has failed to pay THI the liquidated damages as required in section 12.1 of the Franchise Agreement.

35.     THI has been damaged by Vipoo's failure to pay liquidated damages.

**WHEREFORE**, THI demands judgment against Vipoo f or liquidated damages in the amount of $480,000.00, together with interest, attorneys' fees, and costs of suit.

### THIRD COUNT

36.     THI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 35 of the Complaint.

37.     By virtue of the premature termination of the Franchise Agreement, THI sustained a loss of future revenue over the remainder of the fifteen-year term of the Franchise Agreement.

38.     If the Court determines that Vipoo is not liable to pay THI liquidated damages as required by section 12.1 of the Franchise Agreement then, in the alternative, Vipoo is liable to THI for actual damages for the premature termination of the Franchise Agreement.

39.     THI has been damaged by Vipoo's breach of its obligation to operate a Travelodge® guest lodging facility for the remaining term of the Franchise Agreement.

**WHEREFORE**, THI demands judgment against Vipoo for actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit.

### FOURTH COUNT

40.     THI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 39 of the Complaint.

41.     Pursuant to section 7 and Schedule C of the Franchise Agreement, Vipoo was obligated to remit Recurring Fees to THI.

42.     Despite its obligation to do so, Vipoo failed to remit certain of the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $139,585.77.

43.     Vipoo's failure to remit the agreed Recurring Fees constitutes a breach of the Franchise Agreement and has damaged THI.

**WHEREFORE**, THI demands judgment against Vipoo for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $139,585.77, together with interest, attorneys' fees, and costs of suit.

## FIFTH COUNT

44.     THI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 43 of the Complaint.

45.     At the time of the termination of the Franchise Agreement, Vipoo was obligated to pay THI Recurring Fees.

46.     Despite its obligation to do so, Vipoo failed to pay certain of the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $139,585.77.

47.     Vipoo's failure to compensate THI constitutes unjust enrichment and has damaged THI.

**WHEREFORE**, THI demands judgment against Vipoo for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $139,585.77, together with interest, attorneys' fees, and costs of suit.

## SIXTH COUNT

48.    THI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 47 of the Complaint.

49.    Pursuant to the terms of the Guaranty, Shah agreed, among other things, that upon a default under the Franchise Agreement, he would immediately make each payment and perform each obligation required of Vipoo under the Franchise Agreement.

50.    Despite his obligation to do so, Shah has failed to make any payments or perform or cause Vipoo to perform each obligation required under the Franchise Agreement.

51.    Pursuant to the Guaranty, Shah is liable to THI for Vipoo's liquidated damages in the amount of $480,000.00, or actual damages in an amount to be determined at trial, and Vipoo's Recurring Fees due and owing under the Franchise Agreement, in the current amount of $139,585.77.

**WHEREFORE**, THI demands judgment against Shah for all liquidated damages, or actual damages, and Recurring Fees due and owing under the Franchise Agreement, together with interest, attorneys' fees, and costs of suit.

LeClairRyan
Attorneys for Plaintiff
Travelodge Hotels, Inc.

By: _____
**Bryan P. Couch**

Dated:   9/13/16

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

**LeClairRyan**
Attorneys for Plaintiff
Travelodge Hotels, Inc.

By: _____
        **Bryan P. Couch**

Dated: 9│13│16

# EXHIBIT A

Location:      Corpus Christi, TX
Entity No.:    77467-03
Unit No.:      9426

# TRAVELODGE HOTELS, INC.
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement"), dated August 28, 200 8, is between TRAVELODGE HOTELS, INC., a Delaware corporation ("we", "our" or "us"), and VIPOO HOSPITALITY, INC., a Texas corporation ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

**1. Franchise.** We have the exclusive right to franchise to you the distinctive "Travelodge" System for providing transient guest lodging services. We grant to you and you accept the Franchise, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. The Franchise is effective only at the Location and may not be transferred or relocated. You will call the Facility a Travelodge. You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term.

**2. Travelodge/Thriftlodge Franchisee Advisory Association.**

**2.1 Membership.** You automatically become eligible to elect a representative from your region to the Travelodge/Thriftlodge Franchisee Advisory Association ("TTFAA") or any successor organization. The board of TTFAA may consider and discuss common issues relating to advertising and operation of facilities in the System and make recommendations to us regarding such issues and other matters. We may discontinue or restructure TTFAA or its successor at any time.

**2.2 Annual Conference.** A Chain conference is held each year. We will determine the conference date and location after consultation with the TTFAA board. You will pay not less than one "Conference Registration Fee" for each Chain Facility you own. When you pay the Conference Registration Fee, you may send your representative to the conference. Additional Facility representatives may attend subject to conference policies and after payment of an additional Conference Registration Fee for each such additional attendee. You will pay the costs of transportation, lodging and meals (except those we provide as part of the Conference) for your attendees.

**3. Your Improvement and Operating Obligations.**

**3.1 Pre-Opening Improvements.** You must select, acquire, construct and/or renovate the Facility as provided in Schedule D.

3.2 **Operation.** You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with all federal, state and local laws, regulations and ordinances as well as System Standards. You will keep the Facility in a clean, neat, and sanitary condition. You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will be managed by either a management company or an individual manager with significant training and experience in general management of similar lodging facilities. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual and follow standard industry practices for safeguarding cardholder information, including but not limited to, the Payment Card Industry Data Security Standard. You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or portion of the Facility, only with our prior written consent which we will not unreasonably withhold or delay. Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility. You acknowledge that any breach of System Standards for the Facility, its guest amenities, and your guest service performance is a material breach of this Agreement.

3.3 **Training.** You (or a person with executive authority if you are an entity) and the Facility's general manager (or other representative who exercises day to day operational authority) will attend the training programs described in Section 4.1 we designate as mandatory for franchisees and general managers, respectively. You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement. You will pay for all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4.1, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

3.4 **Marketing.**

3.4.1 You will participate in System marketing programs, including the Directory, if any, the Reservation System, and guest loyalty programs. You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System. You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants. You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards. You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.4.2 You will participate in any regional marketing, training or management alliance or cooperative of Chain franchisees formed to serve the Chain Facilities in your area. We may assist the cooperative collect contributions. You may be excluded from cooperative programs and

2

benefits if you do not participate in all cooperative programs according to their terms, including making payments and contributions when due.

3.4.3   The Facility must participate in our Chain-wide Internet marketing activities like other marketing programs including any arrangements we make with third party distribution channels that are mandated in the System Standards Manual.  You shall provide us with information and photographs of the Facility in accordance with System Standards for posting on the Chain website. The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary.  You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards.  You will discontinue any Internet marketing that conflicts, in our reasonable discretion, with Chain-wide Internet marketing activities.  You must honor the terms of any participation agreement you sign for Internet marketing.  You shall pay when due any fees, commissions, charges and reimbursements relating to Internet marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis.  We may suspend the Facility's participation in Internet marketing activity if you default under this Agreement.

3.4.4  You will participate in any guest rewards or loyalty program we determine is appropriate and pay the Loyalty Program Charge associated with the program as set forth in Schedule C.

3.5   **Governmental Matters.**   You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote.  You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings.  You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224.

3.6  **Financial Books & Records; Audits.**

3.6.1  The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards.  You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement.

3.6.2  Upon our request, you will send to us copies of financial statements, tax returns, and other records relating to the Facility for the applicable accounting period that we require under this Agreement and System Standards.  We may notify you of a date on which we propose to audit the Facility's books and records at the Facility. You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date.  You need to inform

3

us where the books and records will be produced. You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements for the Facility. We may also perform an audit of the Facility's books and records without advance notice. Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.6.3 We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.6.2 within 30 days after the date of the initial audit, (ii) you cancel two or more previously scheduled audits, (iii) you refuse to admit our auditors during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records at the audit or send them to us as required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit. Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.6, an "Accounting Procedure Notice." You must also pay any deficiency in Recurring Fees, any Audit Fee we assess you for your default of Section 3.6 as described in Section 4.8, and/or other charges we identify and invoice as a result of the audit. The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year.

3.6.4 You shall, at your expense, prepare and submit to us by the tenth day of each month, a statement in the form prescribed by us, accurately reflecting for the immediately preceding month all Gross Room Revenues and such other data or information as we may require.

3.7 **Inspections.** You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement. You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice. The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the inspector performing the inspection. If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any Reinspection Fee specified in System Standards Manuals plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection. You will also be charged the Reinspection Fee if we must return to the Facility to inspect it as a result of your failure to complete any Improvement Obligation by the deadline established in the Punch List, as set forth in Schedule D. We may also conduct paper and electronic customer satisfaction surveys of your guests and include the results in your final quality assurance score. We may publish and disclose the results of quality assurance inspections and guest surveys.

4

3.8  **Insurance.**  You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual.  Unless we instruct you otherwise, your liability insurance policies will name Travelodge Hotels, Inc., Wyndham Worldwide Corporation, Wyndham Hotel Group, LLC, their current and former affiliates, successors and assigns as additional insureds.

3.9  **Conferences.**  You or your representative will attend each annual Chain conference and pay the Conference Registration Fee described in Section 2.2.  Mandatory recurrent training for franchisees and general managers described in Section 4.1.4 may be held at a Chain conference. The Fee will be the same for all Chain Facilities that we franchise in the United States.  You will receive reasonable notice of a Chain conference.

3.10  **Purchasing.**  You will purchase or obtain certain items we designate as proprietary or that bear or depict the Marks, such as signage, only from suppliers we approve.  You may purchase other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.11  **Good Will.**  You will use reasonable efforts to protect, maintain and promote the name "Travelodge" or "Thriftlodge", as applicable, and its distinguishing characteristics, and the other Marks.  You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to the good will or public image of the Chain or System.  You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners.  You will participate in Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities.  You shall use your best efforts to promote usage of other Chain Facilities by members of the public.  Except as provided in the System Standards Manual or if you obtain our prior written consent, which we may withhold in our sole discretion, neither your nor the Facility shall promote or advertise any competing business at the Facility including, but not limited to, any other guest lodging facility, time share resort, vacation club, residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, unless we or one of our affiliates franchise, manage or own that business.

3.12  **Facility Modifications.**  You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay.  You will pay our Rooms Addition Fee then in effect for each guest room you add to the Facility.  If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay.  You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.13  **Courtesy Lodging.**  You will provide lodging at the "Employee Rate" established in the systems Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at

5

TRAEXCI
223765 Q1 08

the same time.

**3.14 Minor Renovations.** Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 90 days after the notice is issued, having an aggregate cost for labor, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount. You will perform the Minor Renovations as and when the Minor Renovation Notice requires. We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged no more than 200 points and the most recent quality assurance inspection score for the Facility was no more than 225 points (or equivalent scores under a successor quality assurance scoring system we employ), when the Facility is otherwise eligible for a Minor Renovation.

**3.15 Technology Standards & Communications.** You recognize that the System requires you to acquire, operate and maintain a computer-based property management system and provide guests with innovative technology for communications and entertainment. You must purchase the computer system and other equipment and software that we specify. We may modify System Standards to require new technology at all Chain Facilities. At our request, you shall participate in any intranet or extranet system developed for use in connection with the System. Such intranet or extranet system may be combined with that of our affiliates. You shall agree to such terms and conditions for the use of such intranet or extranet system as we may prescribe, which may include, among other things: (a) confidentiality requirements for materials transmitted via such system; (b) password protocols and other security precautions; (c) grounds and procedures for our suspension or revocation of access to the system by you and others; and (d) a privacy policy governing the parties' access to and use of electronic communications posted on electronic bulletin boards or transmitted via the system. You shall pay any fee imposed from time to time by us or a third party service provider in connection with hosting such system.

**4. Our Operating and Service Obligations.** We will provide you with the following services and assistance:

**4.1 Training.** We may offer (directly or indirectly by subcontracting with an affiliate or a third party) general manager and owner orientation training, remedial training and supplemental training.

**4.1.1 General Manager Orientation Training.** We will offer at a location in the United States we designate a general manager orientation training program. The program will not exceed two weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility. We may also offer certain Internet-based training as a supplement to the classroom training experience. Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction no later than 90 days after the Opening Date. Any replacement general manager must complete general manager orientation to our satisfaction within 90 days after he/she assumes the position. If we do not offer a place in general manager orientation within the above time frame, your

6

replacement general manager must attend the next program held at which we offer a place. Your general manager for the Facility must complete general manager orientation even if you employ managers at other Chain Facilities who have already received this training. We charge you tuition for general manager orientation which is payable before the scheduled date of the program. The tuition for your first general manager is $1,250. if he/she attends orientation within the time period required under this section. For any replacement general manager, you must pay the tuition in effect for the program when your manager attends the program. You must also pay for your manager's travel, lodging, meals, incidental expenses, compensation and benefits. We may, at our option, automatically schedule your initial or replacement general manager for a class to be held within the required time period (an "auto-assigned class") and invoice you when we notify you about the date of the class. If your general manager is unable to attend that class, you must notify us at least 15 days before the training start date and re-schedule the general manager for another class to be held within the 90 day period. We may charge you "No-Show Fees" or "Cancellation Fees" if your general manager fails to attend orientation within the required time period or fails to attend a program we have scheduled for him or her without giving us at least 15 days notice of cancellation. This is in addition to the tuition you must pay us for your general manager at the then in effect rate when he/she attends orientation See Section 4.1.5.

4.1.2 **Owner Orientation Training.** We will offer an owner orientation training program to familiarize you with the System, the Chain, and our services. If this is your first System franchise, you (or a person with executive authority if you are an entity) must attend owner orientation preferably within 60 days before, but no later than 60 days after, the Opening Date. If we do not offer a place in owner orientation within this time period, you must attend the next program held at which we offer a place. Financial institutions and real estate mortgage investment conduits are exempt from the obligation to attend owner orientation, but may choose to do so at their option. We charge you tuition of $825 which is payable before the scheduled date for the program. You must also pay for your travel, lodging, meal and incidental expenses. If you are unable to attend an orientation program that you have scheduled with us, you must notify us at least 15 days before the start date and schedule attendance at another class to be held within the 60 day period. We may charge you No-Show or Cancellation Fees if you fail to attend any mandatory orientation program within the required time period or fail to attend a program we have scheduled for you without giving us at least 15 days notice of cancellation. See Section 4.1.5.

4.1.3 **Remedial Training.** We may require you, your general manager and/or your staff to participate in remedial training if the Facility receives a D or F (or equivalent score) on a quality assurance inspection, a D or F +GX score on Medallia electronic guest survey (or equivalent evaluation system), or experiences significant complaints to our guest services department, as determined by us in our sole discretion. This training may be offered at our corporate offices, at a regional location, on-line or at the Facility. You must pay the tuition in effect for this program when it is offered to you. If the training is provided at the Facility, you must provide lodging for our trainers. The length of the remedial training could be up to five (5) days, depending on the severity of the quality assurance and/or customer service issues.

4.1.4 **Supplemental Training.** We may offer other mandatory or optional training programs for reasonable tuition or without charge. This training could be offered in our U.S. training center or

7

other locations or held in conjunction with a Chain lodging conference.  You will pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits and any tuition charge we establish for this training. We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices. We may also offer Internet-based training via the Chain's intranet website.

4.1.5  **No Show and Cancellation Fees.**  If you or your general manager fails to attend orientation within the required time period, or fails to attend a training program as scheduled (including any auto-assigned class) without notifying us in advance, we may charge you a No-Show Fee of up to 100% of the tuition for the program.  If you or any member of your staff cancels participation in any training program less than 15 days before it is scheduled to be held, we may charge you a Cancellation Fee of up to 50% of the tuition for the program. No-Show and Cancellation Fees are in addition to the tuition you will have to pay at the then offered rate when you or your general manager attends the program.  We may assess you additional No-Show or Cancellation Fees for continued failures by you under Section 4.1.

4.2  **Reservation System.**  We will operate and maintain (directly or by contracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion.  We will use Basic Reservation Fees we collect as part of the System Assessment Fees for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System.  We will provide software maintenance and support for any software we license to you to connect to the Reservation System if you are up to date in your payment of Recurring Fees and all other fees you must pay under any other agreement with us or an affiliate. During the Term, the Facility will participate in the Reservation System on an exclusive basis, including entering into all related technology agreements and complying with all terms and conditions which we establish from time to time for participation.  The Facility may not book any reservations through any other electronic reservation system, booking engine or other technology.  All information you collect or capture through your property management system shall be jointly owned by you and us.  We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties.

4.3  **Marketing.**

4.3.1  We will use Marketing Contributions we collect as part of the System Assessment Fees to promote public awareness and usage of Chain Facilities by implementing advertising, promotion, publicity, market research, loyalty marketing and other marketing programs, training programs and related activities, and the production and distribution of Chain publications and directories of hotels.  We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs.  We or an affiliate may be reimbursed from Marketing Contributions for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services.  We are not obligated to supplement or advance funds available from collections of the Marketing Contributions to pay for marketing activities.  We do not promise that the Facility or you will benefit directly or proportionately from marketing activities.

8

4.3.2  We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3  We may issue a Chain Directory in paper, electronic or other format.  We will include the Facility in this Chain Directory if (i) you submit the information we request on time, and (ii) you are not in default under this Agreement at the time we must compile the information for the Directory. If the Directory is issued in paper form, we may supply Directories to you for display at locations specified in the System Standards Manual or policy statements.  We may assess you a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

4.3.4  We may, at our discretion, implement "group booking" programs created to encourage use of Chain Facilities for tours, conventions and the like, possibly for an additional fee.

4.4  **Purchasing and Other Services.**  We may offer optional assistance to you with purchasing items used at or in the Facility.  Our affiliates may offer this service on our behalf.  We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts.  We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards. We may offer optional architectural and design services for the Facility for a separate fee.

4.5  **The System.**  We will control and establish requirements for all aspects of the System.  We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions.  We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances.  We may, in our discretion, change the designation standards for the Chain and then require that you change the designation of the Facility and related presentation of that designation wherever it appears.

4.6  **Consultations and Standards Compliance.**  We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct.  We will provide telephone and mail consultation on Facility operation and marketing through our representatives.  We will offer you access to any Internet website we may maintain to provide Chain franchisees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement.  We may limit or deny access to any such website while you are in default under this Agreement.

4.7  **System Standards Manual and Other Publications.**  We will specify System Standards in the System Standards Manual, policy statements or other publications which we may make available to you via our Chain intranet, in paper copies or through another medium.  We will provide you with access to the System Standards Manual promptly after we sign this Agreement.

9

TRAEXCI
223765 Q1 08

We will notify you via our Chain intranet or another medium of any System Standards Manual revisions and/or supplements as and when issued as well as any other publications and policy statements in effect for Chain franchisees from time to time.

**4.8   Inspections and Audits.**   We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.6. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.7. You will pay us an "Audit Fee" of $1,000.00 when we invoice you for an Audit Fee under Section 3.6. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs, but not more than 5% per year on a cumulative basis. Our inspections are solely for the purposes of checking compliance with System Standards.

**5.   Term.**   The Term begins on the date that we insert in the preamble of this Agreement after we sign it (the "Effective Date") and expires at the end of the fifteenth (15th) Franchise Year. However, each of us has the right to terminate this Agreement, without cause, and as a matter of right, on the 5th or 10th anniversary of the Opening Date by giving prior written notice to the other, provided that if you decide to exercise your right to terminate this Agreement, you must have paid all fees and charges due under this Agreement (and all related agreements, including any promissory notes or other incentive agreements, and any agreements relating to the use of a property management system or Reservation System) as of the date you provide notice of termination and as of the effective date of the termination.  The written notice required by this Section 5 shall be given at least 6 months, but not more than twelve (12) months, before the date of the proposed termination.  You will pay no Liquidated Damages if you comply with the terms of this Section and you perform the post termination obligations specified in this Agreement. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

**6.   Application and Initial Fees.**   You must pay us a non-refundable Application Fee of **$1,000**. If your franchise is for a new construction or conversion Facility, you must pay us an Initial Fee. If you are a transferee of an existing Facility or are renewing an existing franchise, you will pay us a Relicense Fee.  The amount of your Initial or Relicense Fee is **$30,000** which shall be paid when you sign this Agreement and is fully earned when we sign this Agreement.

**7.   Recurring Fees, Taxes and Interest.**

7.1      You will pay us certain "Recurring Fees" each month of the Term payable in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States).  The Recurring Fees described in Section 7.1 are payable ten days after the month in which they accrue, without billing or demand.  Other Recurring Fees are payable at the times set forth in the System Standards. Recurring Fees include the following:

7.1.1  A "Royalty" equal to four and five-tenths percent (4.5%) of Gross Room Revenues of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of

10

the Term.

7.1.2 A "System Assessment Fee" as set forth in Schedule C including a "Marketing Contribution" and a "Daily Guest Room Charge" for advertising, marketing, training and other related services and programs, and a "Basic Reservation Fee" for the Reservation System, accrues from the Opening Date until the end of the Term, including during reservation suspension periods. We collect and deposit these Fees from franchisees, then disburse and administer the funds collected by means of a separate account or accounts. We may use the System Assessment Fees we collect, in whole or in part, to reimburse our reasonable direct and indirect costs, overhead or other expenses of providing marketing, training and reservation services. You will also pay or reimburse us as described in Schedule C "Additional Fees" such as commissions we pay to travel and other agents for certain reservations at the Facility plus a reasonable service fee, fees levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet and other reservation systems and networks, and fees for additional services and programs. We may charge Facilities using the Reservation System outside the United States for reservation service using a different formula. We may change, modify, add or delete the System Assessment Fee and/or Additional Fees in accordance with Schedule C.

7.2     You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for the privilege of doing business by us in your State. You will pay Taxes to us when due.

7.3     "Interest" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

7.4     If a Transfer occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new franchisee for the Facility.

## 8. Indemnifications.

8.1 Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property

11

damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2 You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest. We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

8.3 We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

## 9. Your Assignments, Transfers and Conveyances.

9.1 **Transfer of the Facility.** This Agreement is personal to you (and your owners if you are an entity). We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you. You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent. If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your Franchise is subject to termination when the Transfer occurs. The Franchise is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2 **Public Offerings and Registered Securities.** You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $15,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange

12

or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3 **Conditions.** We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a franchisee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new franchise applicant, pay the Application and Relicense Fees then in effect, sign the form of Franchise Agreement we then offer in conversion transactions and agree to renovate the Facility as if it were an existing facility converting to the System, as we reasonably determine. We will provide a Punch List of improvements we will require after the transferee's Application is submitted to us. We may, in our discretion, require the transferee to place funds in escrow, at its expense, in order to complete all necessary renovations. We may require structural changes to the Facility if it no longer meets System Standards for entering conversion facilities or, in the alternative, condition our approval of the Transfer on one or more of the following: limit the transferee's term to the balance of your Term, add a right to terminate without cause exercisable by either party after a period of time has elapsed, or allow you to terminate the Franchise when you sell the Facility and pay us Liquidated Damages under Section 12.1 at the same rate as you would pay if the termination occurred before the Opening Date. Such payment would be due and payable when you transfer possession of the Facility. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

9.4 **Permitted Transferee Transactions.** You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the Franchise Agreement form then offered prospective franchisees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

9.5 **Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

9.6 **Notice of Transfers.** You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to

TRAEXC1
223765 Q1 08

Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and owner ship percentages of your owner(s) at our request.

**10. Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

**11. Default and Termination.**

**11.1 Default.** In addition to the matters identified in Sections 3.1 and 3.6 you will be in default under this Agreement if (a) you do not pay us when a payment is due under this Agreement or any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement. If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you, under Section 11.2. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed. In the case of default resulting from the Facility's failure to meet Quality Standards as measured by a quality assurance inspection, if you have acted diligently to cure the default but cannot do so, and the default does not relate to health or safety, we may, in our discretion, enter into an improvement agreement with you provided you request such an agreement within 30 days after receiving notice of the failing inspection. If we have entered into an improvement agreement, you must cure the default within the time period specified in the improvement agreement which shall not exceed 90 days after the failed inspection. We may terminate this Agreement and any or all rights granted hereunder if you do not perform that improvement agreement.

**11.2 Termination.** We may terminate the this Agreement effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Schedule D due to your failure to perform your Improvement Obligation, (2) you discontinue operating the Facility as a "Travelodge" or "Thriftlodge," as appropriate, (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another franchise agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due

14

in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing process is completed, (11) you or any of your Equity Interest owners contest in court the ownership or right to franchise or license all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

## 11.3  **Casualty and Condemnation.**

11.3.1  You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations. You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as an extended stay or transient lodging facility after the Casualty.

11.3.2  You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

11.3.3  Any protected territory covenants will terminate when you give us notice of any proposed Condemnation or that you will not restore the Facility after a Casualty.

11.4  **Our Other Remedies.**  We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with us relating to the Facility, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default. All System Assessment Fees accrue during the suspension period. We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards. Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform. We may charge you, and you must pay as a condition precedent to restoration of reservation service, a Service Interruption Fee specified on Schedule C to reimburse us for our costs associated with service suspension and restoration. We may omit the Facility from the Directory if you are in default on

15

the date we must determine which Chain Facilities are included in the Directory. You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief. We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice. Our consent or approval may be withheld if needed while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

11.5  **Your Remedies.**  If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation. To the extent permitted by applicable law, this action shall be your exclusive remedy. We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

## 12. Liquidated Damages.

12.1  **Generally.**  If we terminate this Agreement under Section 11.2, or you terminate this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us within 30 days following the date of termination, as Liquidated Damages, an amount equal to the sum of accrued Royalties and System Assessment Fees during the immediately preceding 24 full calendar months (or the number of months remaining in the unexpired Term (the "Ending Period") at the date of termination, whichever is less). If the Facility has been open for fewer than 24 months, then the amount shall be the average monthly Royalties and System Assessment Fees since the Opening Date multiplied by 24. You will also pay any applicable Taxes assessed on such payment and Interest calculated under Section 7.3 accruing from 30 days after the date of termination. Before the Ending Period, Liquidated Damages will not be less than the product of $2,000. multiplied by the number of guest rooms you are then authorized to operate under Schedule B of this Agreement, as amended. If we terminate this Agreement under Schedule D before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable for termination under Section 11.2. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement is not affected.

12.2  **Condemnation Payments.**  In the event a Condemnation is to occur, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11.3.2, or until the Condemnation occurs, whichever is longer. You will pay us Liquidated Damages equal to the average daily Recurring Fees for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period if the Condemnation is completed before the one year notice period expires. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). You will pay no Liquidated Damages if the Condemnation is completed after the one year notice period expires, but the fees set forth in Section 7 must be paid when due until Condemnation is completed.

16

**13.   Your Duties At and After Termination.**   When a Termination occurs for any reason whatsoever:

13.1  **System Usage Ceases.** You will immediately stop using the System to operate and identify the Facility.  You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility.  You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features.  You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces. You will cease all Internet marketing using any Marks to identify the Facility.

13.2  **Other Duties.**  You will pay all amounts owed to us under this Agreement within 10 days after termination.  You will owe us Recurring Fees on Gross Room Revenues accruing while the Facility is identified as a "Travelodge" or "Thriftlodge," including the System Assessment Fees for so long as the Facility receives service from the Reservation System.  We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may notify third parties that the Facility is no longer associated with the Chain.  We may also, to the extent permitted by applicable law, and without prior notice enter the Facility and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination.  You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage.  We will exercise reasonable care in removing or painting over signage.  We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

13.3  **Advance Reservations.**  The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

13.4  **Survival of Certain Provisions.**  Sections 3.6 (as to audits, for 2 years after termination), 3.11, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of this Agreement.

**14.   Your Representations and Warranties.**   You expressly represent and warrant to us as follows:

14.1   **Quiet Enjoyment and Financing.**   You own, or will own prior to commencing improvement, or lease, the Location and the Facility.  You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your

TRAEXC1
223765 Q1 08

performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

14.2 **This Transaction.** You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your owners, Board of Directors and lenders. No executory franchise, license or affiliation agreement for the Facility exists other than this Agreement. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application. You will submit to us the documents about the Facility, you, your owners and your finances that we request in the Franchise Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement. To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or is, a terrorist, a "Specially Designated National" or a "Blocked Person" under U.S. Executive Order 13224, in lists published by the U.S. Department of the Treasury's Office of Foreign Assets Control, or otherwise.

14.3 **No Misrepresentations or Implied Covenants.** All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

15. **Proprietary Rights.**

15.1 **Marks and System.** You will not acquire any interest in or right to use the System or Marks except under this Agreement. You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2 **Inurements.** All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit. No good will shall attach to any secondary designator that you use.

18

15.3 **Other Locations and Systems.** We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as franchisor or franchisee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory. You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks. We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

15.4 **Confidential Information.** You will take all appropriate actions to preserve the confidentiality of all Confidential Information. Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement. You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software). You will use Confidential Information only for the Facility and to perform under this Agreement. Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended. Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years. We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15.5 **Litigation.** You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware. We alone handle disputes with third parties concerning use of all or any part of the System. You will cooperate with our efforts to resolve these disputes. We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

15.6 **The Internet.** You may use the Internet to market the Facility subject to this Agreement and System Standards. You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image

19

TRAEXC1
223765 Q1 08

or language confusingly similar to a Mark except as otherwise expressly permitted by the System Standards Manual or with our written consent. You will assign to us any such identification at our request without compensation or consideration. You must make available through the Reservation System and the Chain website all rates you offer to the general public via Internet marketing arrangements with third parties. You agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to intermediaries and retailers on your behalf or for Chain Facilities to participate in their programs. You must participate in the Chain's best available rate on the Internet guarantee or successor program. The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards. Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

## 16. Relationship of Parties.

16.1 **Independence.** You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2 **Joint Status.** If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

## 17. Legal Matters.

17.1 **Partial Invalidity.** If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect. If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2 **Waivers, Modifications and Approvals.** If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice. Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel. All

modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

17.3  **Notices.**  Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, or (iii) by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party (x) at its address stated below or as it may otherwise designate by notice, or (y) by such other means as to result in actual or constructive receipt by the person or office holder designated below.  The parties may also communicate via electronic mail between addresses to be established by notice. You consent to receive electronic mail from us. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

Travelodge Hotels, Inc.:
Our address: 1 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278
Attention: Vice President-Franchise Administration; Fax No. (973) 753-8311

Your name: VIPOO HOSPITALITY, INC.,
Your address: 6200 Savoy #550, Houston, TX 77036,
Attention: Vinod Shaw; Your fax No.: _____.

17.4  **Remedies.**  Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity.  The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

17.5  **Miscellaneous.**  This Agreement is exclusively for the benefit of the parties.  There are no third party beneficiaries.  No agreement between us and anyone else is for your benefit.  The section headings in this Agreement are for convenience of reference only.

17.6  **Choice of Law; Venue; Dispute Resolution.**

17.6.1  This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles.  The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.

17.6.2  The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives.  If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation.  Either party may request mediation through the National Franchise Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution, Inc.  We will provide you with the contact address for that organization.  The mediation will be conducted by a mutually acceptable and neutral third party.  If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

TRAEXCI
223765 Q1 08

17.6.3 You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

**17.6.4 WAIVER OF JURY TRIAL. THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE FRANCHISOR, THE FRANCHISEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

17.6.5 Any judicial proceeding directly or indirectly arising from or relating to this Agreement shall be considered unique as to its facts and may not be brought as a class action. You and each of the owners of your Equity Interests waive any right to proceed against us by way of class action.

**17.7 Special Acknowledgments. You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.**

**17.7.1 You received our Franchise Disclosure Document for prospective franchisees ("FDD") at least 14 days before signing this Agreement and paying any fee to us.**

**17.7.2 Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement or in the FDD. You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement or in the FDD.**

**17.7.3 This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the Franchise.**

**17.7.4 You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the FDD or in a writing that is attached to this Agreement.**

**17.7.5 You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.**

17.8 **Force Majeure.** Neither you nor we shall be liable for loss or damage or deemed to be in breach of this Agreement if the failure to perform obligations results from: (a) windstorms, rains, floods, earthquakes, typhoons, mudslides or other similar natural causes; (b) fires, strikes, embargoes, war, acts of terrorism, or riot; (c) legal restrictions that prohibit or prevent performance; or (d) any other similar event or cause beyond the control of the party affected. Any delay resulting from any of such causes shall extend performance accordingly or excuse performance, in whole or

22

in part, as may be reasonable, so long as a remedy is continuously and diligently sought by the affected party, except that no such cause shall excuse payment of amounts owed at the time of such occurrence or payment of Recurring Fees and other amounts due to us subsequent to such occurrence other than a governmental or judicial order prohibiting such payments.

17.9 **Protected Territory**.  We will not own, operate, lease, manage, franchise or license any party but you to operate a Chain Facility in the "Protected Territory", defined below, while this Agreement is in effect.  We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you.  We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory.  While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise (i) any guest lodging facility other than the Facility in the Protected Territory unless we or our affiliate franchises or licenses the facility, and/or (ii) any time share resort, vacation club, residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, for any facility or business that shares directly or indirectly, common areas, amenities, recreation facilities, services, supplies or support activities with the Facility.  You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities.  This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located within the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its franchise with us terminates or is not renewed.  You acknowledge that the Protected Territory fairly represents the Facility's trading area, and that there are no express or implied territorial rights or agreements between the parties except as stated in this Section.  You irrevocably waive any right to seek or obtain the benefits of any policy we now follow or may in the future follow to notify you about proposed Chain Facilities in the general area of the Facility, solicit information about the effect of the proposed Chain Facility on the revenue or occupancy of the Facility or decide whether to add the proposed Chain Facility to the Chain based on the potential effect of the proposed Chain Facility on the Facility or its performance.  The covenants in this Section are mutually dependent; if you breach this Section, your Protected Territory will be the Location only.  The Protected Territory means beginning at and including a point three miles North of the Facility on I-37 (Latitude 27.82429°N and Longitude 97.52745°W) and proceeding South on I-37, extending ½ mile on either side of the centerline, up to and including a point three miles South of the Facility on I-37 (Latitude 27.80263°N and Longitude 97.43483°W)..

**18.   Special Stipulations.**  The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions.  You acknowledge that these stipulations and any changes made to the body of the Agreement at your request or in response to other changes to our form agreement are the product of arms' length negotiations with us and represent mutually agreed, material inducements to enter into this Agreement, beneficial to you and supported by adequate consideration from both parties.  These are personal to you and are not transferable or assignable except to a Permitted Transferee.

23

**18.2. Special Combined Fees.** Notwithstanding Section 7.1, you will pay the "Combined Fee," consisting of the Royalty and the Basic Service Charge (excluding the Daily Guest Room Charge of ten cents per available guest room per day for the first 100 rooms and five cents per day for each additional room of the Facility, commissions and related service charges, Internet fees, the Loyalty Program Charge, service fees and charges, guest reward and affinity program fees, guest complaint assessments, GDS Fees and similar fees and charges described in Schedule C) to us at the rates set forth in this Section.

18.2.1 The Combined Fee shall be six and five tenths percent (6.5%) of Gross Room Revenues accruing during the first License Year; and

18.2.2 The Combined Fee shall be seven and five tenths percent (7.5%) of Gross Room Revenues accruing during the second License Year; and

18.2.3. The Royalty and System Assessment Fees shall be computed and paid at the rates specified in Section 7.1 on Gross Room Revenues accruing after the second License Year.

18.2.4 The rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Combined Fee shall reset to the rates specified in Section 7, if and as of the date (i) a Termination occurs, or we send you a notice of default and you fail to cure the default within the time specified, if any, in the notice of default, or (ii) after you satisfy the Improvement Obligation, the Facility receives a quality assurance inspection score of more than 200 (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of less than 200 in a reinspection to be performed not less than 60 days after the initial inspection.

**18.3 Reduced Relicense Fee.** If (i) you are not then in default under this Agreement, (ii) we receive your proposed transferee's Franchise Application and Application Fee before you Transfer the Facility, and (iii) we receive the Franchise Application before the end of the second Franchise Year, then the Relicense Fee for a Transfer will be $5,000. If the conditions are not satisfied, and after the second Franchise Year, the Relicense Fee will be as specified in Section 7.4.

TRAEXC1
223765 Q1 08

IN WITNESS WHEREOF, the parties have executed this Agreement on this _22nd_ day of ___December___, 200_8_ and agree to be bound by the terms and conditions of this Agreement as of the Effective Date.

**WE:**
TRAVELODGE HOTELS, INC.

By: _____
        (Vice) President

**YOU**, as franchisee:
VIPOO HOSPITALITY, INC.

By: _____
        (~~Vice~~) President

25

## APPENDIX A

## DEFINITIONS

Agreement means this Franchise Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Schedule D.

Basic Reservation Fee means the fees set forth in Section 7.1.2 and Schedule C, as modified in accordance with this Agreement for reservation services and other charges.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Registration Fee means the fee charged for attendance at the annual Chain conference.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence.  Confidential Information includes the "Standards of Operation and Design Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

Directory means any general purpose directory we issue, whether printed, web-based, or issued in another medium, which may list the names and addresses of Chain Facilities in the United States,

TRAEXC1
223765 Q1 08

and at our discretion, other System facilities located outside the United States, Canada and Mexico.

<u>Effective Date</u> means the date we insert in the Preamble of this Agreement after we sign it.

<u>Equity Interests</u> shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

<u>Equity Transfer</u> means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does <u>not</u> occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

<u>Facility</u> means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing or to be constructed at the Location on or after the Effective Date.

<u>FF&E</u> means furniture, fixtures and equipment.

<u>FF&E Standards</u> means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

<u>Food and Beverage</u> means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

<u>Franchise</u> means the non-exclusive franchise to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

<u>Franchise Year</u> means:

    (i) *If the Opening Date occurs on the first day of a month:* the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period; or

27

(ii) *If the Opening Date does not occur on the first day of a month:* the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period.

Gross Room Revenues means gross revenues attributable to or payable for rentals of guest rooms *at the Facility, including all credit transactions, whether or not collected,* but *excluding separate* charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Schedule D.

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6, if the Agreement is for a new construction or conversion franchise.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at 910 Corn Products Rd., Corpus Christi, TX 78409, as more fully described in Schedule A.

Losses and Expenses means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection; and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($20.00 on the Effective Date) if the drawee dishonors any check that you submit to us.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

Marketing Contribution means the fee you pay to us under Section 7.1.2 and Schedule C, as amended, for advertising, marketing, training and other services.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Travelodge" or "Thriftlodge", the "Sleepy Bear" logo and other marks (U.S. Reg. Nos. 1,474,602;

1,869,185; 1,868,724; 1,879,457; 1,539,812; 848,208; 1,868,761; 1,001,682; 1,006,905) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Minor Renovation means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.14.

Minor Renovation Ceiling Amount means $3,000.00 per guest room.

Minor Renovation Notice means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3.14.

Opening Date has the meaning specified in Schedule D.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Prototype Plans has the meaning specified in Schedule D for New Construction Facilities.

Punch List means the list of upgrades and improvements attached as part of Schedule D, which you are required to complete under Section 3.1 and Schedule D.

Recurring Fees means fees paid to us on a periodic basis, including without limitation, Royalties, System Assessment Fees, and other reservation fees and charges as stated in Section 7.

Relicense Fee means the fee your transferee pays to us when a Transfer occurs, or the fee you pay to us if you are renewing an existing franchise.

Reinspection Fee means the fee you must pay to us under Section 3.7 if you do not complete your Punch List on time, fail any inspection or do not cooperate with our inspector or inspection System Standards.

Reservation System or "Central Reservation System" means the system for offering to interested

29

parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Royalty means the monthly fee you pay to us for use of the System under Section 7.1.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

Service Interruption Fee means the fee you pay us when we suspend Central Reservation System service because you default under this Agreement, in the amount specified in Schedule C.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following:   (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Assessment Fees means the assessments charged as set forth in Section 7.1.2.

System Standards means the standards for participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Standards of Operation and Design Manual and any other manual we publish or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means a termination of this Agreement.

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation

30

of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility. A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as franchisee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Travelodge Hotels, Inc., a Delaware corporation, its successors and assigns.

31

## SCHEDULE A

(Legal Description of Facility)

TRAEXC1
223765 Q1 08

EXHIBIT "A"

a.     Right of parties in possession. (Owner's Policy only)

b.     Any visible and apparent unrecorded easements on the insured property. (Owner's Policy only)

c.     Rights of tenants in possession under any and all outstanding lease agreement recorded or unrecorded.

d.     Thirty foot (30') Yard Requirement across the front, adjacent to Corn Products Road and Five foot (5') Utility Easement across the rear, all as shown by the map or plat thereof recorded in 63, Page 109, Map Records of Nueces County, Texas. (Tract I - Lots 3 & 4)

e.     Ten foot (10') Utility easement across Northern portion, approximately 210 feet from the most northern corner; Five foot (5') Utility Easement along East boundary line; Thirty foot (30') Building Line along Corn Products Road as shown by the map or plat thereof recorded in Volume 40, Page 188, Map Records of Nueces County, Texas. (Tract II - Lot 2)

f.     Fifteen foot (15') Utility easement widening to approximately 20 feet at the East boundary running along the South boundary line of Lot One (1), for a distance of 120 feet traversing Westerly from the Southeast and a Twenty foot (20') Building Line along Corn Products Road and Interstate Highway #37 as shown by map or plat thereof, recorded in Volume 41, Page 151, Map Records of Nueces County, Texas. (Tract II - Lot 1)

g.     Easements and reservations as shown according to the maps or plats thereof recorded in Volume 63, Page 109, Map Records, Volume 40, Page 188, Map Records and Volume 41, Page 151, Map Records, Nueces County, Texas.

h.     Memorandum of Lease dated September 14, 2001 executed by Coinmach Corporation recorded under County Clerk's File No. 2001048108, Official Public Records of Nueces County, Texas.

i.     Easement and Right-of-Way from William A. Davis, E. Michael Harding and Roy L. Seikel, as Partners to Central Power and Light Company, a Texas corporation, dated January 27, 1983, recorded under Clerk's File No. 317274, Volume 1866, Page 205, Deed Records of Nueces County, Texas, for electric transmission lines, etc., over, under, across and upon Lots 2, 3, and 4, Block 5, Interstate Industrial Complex.

j.     Easement dated May 26, 1982 from 1-37 Gulf Corporation to 1-37 Gulf Limited, as recorded in Volume 1833, page 149, Deed Records, Nueces County, Texas. Renewed and defined by instrument dated August 16, 1990 executed by Airport Hotel, Inc. and Lincoln Savings Bank, F.S.B to MBank Corpus Christi, N. A., et al, recorded under County Clerk's File No. 727372, Volume 2220, Page 291, Deed Records of Nueces County, Texas; and as contained in Deed with Bill of Sale with Vendor's Lien dated November 18, 1991, from Corpus Christi National Bank to O. Rene Case, recorded on April 14, 1992, under Clerk's File No. 800793, Official Public Records of Nueces County, Texas.

k.     Easement and Right-Of-way dated May 6, 1975, from William A. Davis, E. Michael Harding, and Roy L. Seikel, a partnership, to Central Power and Light Company, recorded under Clerk's File No. 984820, Volume 1538, Page 704, Deed Records of Nueces County, Texas.

l.     Easement dated May 26, 1982 from 1-37 Gulf Corporation to 1-37 Gulf Limited, as recorded under Clerk's File No. 281925, Volume 1833, page 149, Deed Records, Nueces County, Texas.

m.    All terms, conditions and stipulations contained in Agreed Final Judgment rendered under Cause No. 96-3376-B on October 27, 1997, by O. Rene Case, Individually and d/b/a The Travelodge Hotel versus I.G.M. Enterprises, Inc., a Georgia Corporation, Individually and d/b/a Howard Johnson Airport Hotel and Convention Center; et al; regarding easement recorded under Clerk's File No. 727372, Volume 2220, Page 291, Deed Records of Nueces County, Texas. Together with Writ of Permanent Injunction dated November 19, 1997, a certified copy thereof recorded under Clerk's File No. 1997042824, Official Public Records of Real Property of Nueces County, Texas; and subsequent Agreed Final Judgment dated November 19, 1997, a certified copy thereof recorded under Clerk's File No. 1997042825, Official Public Records of Real Property of Nueces County, Texas, being pursuant to District Court Suit filed under Cause No. 96-3376-B, Styled: O. Rene Case, Individually and d/b/a The Travelodge Hotel, plaintiff, VS.I.G.M. Enterprises, Inc., et al. Assigned in Deed with Bill of Sale with Vendor's Lien dated November 18, 1991 executed by Corpus Christi National Bank to O. Rene Case, recorded under Clerk's file No. 800793, Official Public Records of Nueces County, Texas.

n.    Easement and Right-of-Way for Pipeline dated January 28, 1943, from Atlee McCampbell and W. B. McCampbell to Republic Natural Gas Company, recorded under Clerk's File No. 184159, Volume 288, Page 74, Deed Records of Nueces County, Texas. Assigned to Socony Mobil Oil Company, Inc., by Conveyance, Assignment and Transfer dated December 28, 1961, recorded under Clerk's File No. 590029, Volume 184, Page 326, Oil and Gas Records of Nueces County, Texas.

o.    Easement and Right-of-Way for Pipeline dated December 8, 1962, from Violet R. McCampbell, Individually and as Independent Executrix of the Estate of W. B. McCampbell, Deceased and Atlee McCampbell to Pittsburgh Plate Glass Co., recorded under Clerk's File No. 626392, Volume 1003, Page 276, Deed Records of Nueces County, Texas.

p.    Easement and Right-Of-Way for Pipeline from Atlee McCampbell and Violet R. McCampbell, Individually and as Independent Executrix of the Estate of W. B. McCampbell, Deceased, to Houston Natural Gas Corporation, dated June 17, 1963, recorded under Clerk's File No. 628177, Volume 1006, Page 152, Deed Records, Nueces County, Texas.

q.    Easement and Right-of-Way for Highway dated August 9, 1963, from Atlee McCampbell and Violet R. McCampbell, Individually and as Independent Executrix of the Estate of W. B. McCampbell, Deceased to the State of Texas, recorded under Clerk's File No. 631449, Volume 1010, Page 573, Deed Records of Nueces County, Texas.

r.    Easement and Right-Of-Way for Pipeline from Atlee McCampbell and Violet R. McCampbell, Individually and as Independent Executrix of the Estate of W. B. McCampbell, Deceased, to Florida Gas Transmission Company, a Delaware corporation, dated September 12, 1963, recorded under Clerk's File No. 634208, Volume 1015, Page 1, Deed Records, Nueces County, Texas.

s.    Easement and Right-Of-Way for Pipeline from Atlee McCampbell and Violet R. McCampbell, Individually and as Independent Executrix of the Estate of W. B. McCampbell, Deceased, to Coastal States petrochemical Company, a Texas corporation, dated July 15, 1963, recorded under Clerk's File No. 647733, Volume 1036, Page 63, Deed Records, Nueces County, Texas.

t.    Oil and Gas Lease dated August 18, 1964, from Atlee McCampbell and Violet R. McCampbell to Southern Petroleum Exploration, Inc., recorded under Clerk's File No. 660828, Volume 202, Page 302, Oil and Gas Records of Nueces County, Texas, together with all rights incident to the owners and lessees of the minerals. Title to said interest not checked subsequent to aforesaid instrument.

u.    Oil and Gas Lease dated August 27, 1965, from Atlee McCampbell and Violet R. McCampbell to J. R. McDonald, recorded under Clerk's File No. 691309, Volume 218, Page 406, Oil and Gas Records of Nueces County, Texas, together with all rights incident to the owners and lessees of the minerals. Title to said interest no checked subsequent thereto.

v.   Oil and Gas Lease from Violet R. McCampbell, Thomas A. McCampbell, Courtney M. Barker and William B. McCampbell, to Phillip N. Bell, as Lessee, dated August 28, 1978, recorded under Clerk's File No. 106570, Volume 323, Page 958, Oil and Gas Records, Nueces County, Texas, leasing subject property and other property for a term of 3 years plus production; together with all rights incident to the owners and lessees of the minerals. Title to said interest not checked subsequent to date of aforesaid instrument.

w.   Oil, Gas and Mineral Lease dated October 15, 1981 from Corpus Christi National Bank, Trustee for the Violet R. McCampbell Trustee, et al, to Sexton Oil and Minerals Corporation recorded in counterparts under Clerk's File No. 250988, Volume 350, Page 840; Clerk's File No. 250989, Volume 350, Page 853; Clerk's File No. 250990, Volume 350, Page 864; and Clerk's File No. 250991, Volume 350, Page 876; all in the Oil and Gas Records of Nueces County, Texas. Together with all rights incident to the owners and lessees of the minerals. Title to said interest not checked subsequent to date of aforesaid instrument.

x.   Oil, Gas and Mineral Lease dated January 10, 1985 from Courtney M. Barker to Collins W. Brown, recorded under Clerk's File No. 428490, Volume 377, Page 412, Oil and Gas Records, Nueces County, Texas. Together with all rights incident to the owners and lessees of the minerals. Title to said interest not checked subsequent to date of aforesaid instrument.

y.   Oil and Gas Lease dated January 10, 1985 from InterFirst Bank, Trustee for the Sara May Meriwether Trust to Collins W. Brown, recorded under Clerk's File No. 428491, Volume 377, Page 424, Oil and Gas Records, Nueces County, Texas. Together with all rights incident to the owners and lessees of the minerals. Title to said interest not checked subsequent to date of aforesaid instrument.

z.   Oil, Gas and Mineral Lease dated January 10, 1985 from William B. McCampbell to Collins W. Brown, recorded under Clerk's File No. 428492, Volume 377, Page 436, Oil and Gas Records, Nueces County, Texas. Together with all rights incident to the owners and lessees of the minerals. Title to said interest not checked subsequent to date of aforesaid instrument.

aa.  Oil, Gas and Mineral Lease dated January 23, 1985 from Don Alex, Independent Executor of the Estate of the Estate of Thomas A. McCampbell, Deceased to Collins W. Brown, recorded under Clerk's File No. 437274, Volume 378, Page 476, Oil and Gas Records, Nueces County, Texas. Together with all rights incident to the owners and lessees of the minerals. Title to said interest not checked subsequent to date of aforesaid instrument.

bb.  Mineral and/or Royalty Deed dated February 10, 1984 from Sara May Meriwether, Individually and as Independent Executrix of the Estate of Violet R. McCampbell, to InterFirst Bank Austin, N.A., as Trustee, recorded under Clerk's File No. 363496, Volume 1907, Page 654, Deed Records of Nueces County, Texas. Together with all rights incident to the owners and lessees of the minerals. Title to said interest not checked subsequent to date of aforesaid instrument.

cc.  Exception and Reservation of all oil, gas and minerals, contained in Warranty Deed dated October 22, 1973, from Atlee McCampbell and Violet It McCampbell, a widow, to William A. Davis, E. Michael Harding, and Roy L. Seikel, recorded under Clerk's File No. 928811, Volume 1478, Page 301, Deed Records, Nueces County, Texas, together with all rights of the owners and any lessees of the minerals. Grantors however, waived all rights of ingress and egress and use of the surface of said land for purposes connected with all mineral development and operations thereunder. Title to said interest not checked subsequent to date of aforesaid instrument.

dd.  Easement and Right-of-Way dated November 27, 1956, from Atlee McCampbell and W. B. McCampbell to the City of Corpus Christi, recorded under Clerk's File No. 612189, Volume 981, Page 89, Deed Records of Nueces County, Texas. (Affects Tract II)

ee.   EASEMENT dated May 26, 1982, executed by 1-37 Gulf Corporation to and with 1-37 Gulf Limited, a Texas Limited Partnership, recorded under Clerk's File No. 281925, Volume 1833, Page 149, Deed Records of Nueces County, Texas. Renewed and defined by Instrument dated August 16, 1990, executed by Airport Hotel, Inc. and Lincoln Savings Bank, F.S.B. to MBank Corpus Christi, et al, recorded under Clerk's File No. 727372, Volume 2220, Page 291, Deed Records of Nueces County, Texas. Said Easement conveyed in Deed with Bill of Sale with Vendor's Lien dated November 18, 1991, from Corpus Christi National Bank to O. Rene Case, recorded under Clerk's File No. 800793, Official Public Records of Real Property of Nueces County, Texas. (Affects Tract II)

ff.   Reciprocal Easement Agreement dated December 6, 2006 by and between 6255 Interstate 37 LP, a Texas limited partnership and FJ Group, L.L.C., a Texas limited liability company recorded under Clerk's file No. 2006062723, Official Public Records of Nueces County, Texas. Ratification and Correction of Reciprocal Easement Agreement dated August 16, 2007, executed by and between Fran & Associates, Inc. and FJ Group, L.L.C. recorded under Clerk's File No.

2007051844, Official Public Records of Nueces County, Texas. (Affects Tract II)

gg.   Terms and Conditions of that certain Declaration of License Agreement recorded November 20, 1995, executed by and between Howard Johnson Franchise Systems, Inc. and I.G.M. Enterprises, Inc., recorded under Clerk's File No. 987197, Official Public Records of Real Property of Nueces County, Texas. (Affects Tract 11)

hh.   Terms, provisions and conditions as contained in First Refusal and Option Agreement dated August 3, 1995 executed by and between Fran and Associates, Inc. and I.G.M. Enterprises, Inc. recorded under Clerk's file No. 972610, Official Public Records of Nueces County, Texas. (Affects Tract II)

ii.   Building, Zoning, Plating and Regulatory Laws and Ordinances of any municipal or other governmental authorities.

## SCHEDULE B

**PART 1:**    YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest |
|------|----------------------|-------------------------|
| **Vinod Shah** | **81%** | **common stock** |
| **Vinod Kumar Mangwani Gidwani** | **19%** | **common stock** |

**PART II:**    THE FACILITY:

Primary designation of Facility: **Travelodge**

Number of approved guest rooms: **164 (158 rentable, 6 non-rentable)**

Parking facilities (number of spaces, description): **at least 164**

Other amenities, services and facilities: **refer to Punchlist**

_____
Initial

33

TRAEXCI
223765 Q1 08

# TRAVELODGE HOTELS, INC.
## SCHEDULE C
### March 2008

I.     **System Assessment Fee**

The System Assessment Fee includes the Marketing Contribution, the Daily Guest Room Charge and the Basic Reservation Fee. The Marketing Contribution is equal to two percent (2%) of Gross Room Revenues. The Daily Guest Room Charge is ten cents ($.10) per available guest room per day for the first 100 rooms and five cents ($.05) per available guest room per day for each additional room of the Facility. The Basic Reservation Fee is 2% of Gross Room Revenues. We reserve the right, in our sole discretion, to increase or modify the System Assessment Fees for all Chain Facilities from time to time to cover costs (including reasonable direct or indirect overhead costs) related to the services and programs referenced in Section 7.1.2 after consultation with the TTFAA board

II.    **Additional Fees**

A.     **Loyalty Program Charge**

We charge a Loyalty Program Charge for your participation in the Wyndham Rewards or successor guest loyalty program. The Loyalty Program Charge is up to 5% of the Gross Room Revenues accruing from each "qualifying stay" at the Facility as defined in the Front Desk Guide. We will proactively match and award members with points or other program currency they earn on qualified stays even if they do not present their Wyndham Rewards membership card upon check–in. You will be billed monthly in arrears for qualifying stays by program members during the preceding month.

B.     **Guest Services Assessment**

We will contact you if we receive any guest complaint about you or the Facility within 60 days after the guest's arrival date at your Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest. If you do not resolve any complaint within 7 business days after we refer it to you and the guest contacts us again to seek resolution, we will contact you to resolve the complaint within 24 hours. If you do not notify us of the resolution, if any, that you have reached with the guest within 24 hours after we contact you, we will charge you a "Guest Services Assessment" of $100.00, plus the costs we incur to settle the matter with the guest. In addition, if the number of guest complaints per 1,000 occupied room nights about you or the Facility in a calendar year exceed the "Annual Facility Allotment" we establish with the approval of the TTFAA Board, we will charge you a "Processing Fee" of $60.00 for each additional complaint we receive during that year, regardless of whether you are able to resolve it to the guest's satisfaction. The Guest Services Assessment and the Processing Fee are intended only to reimburse us for the costs of complaint handling and are not intended as penalties or liquidated damages. All guest complaints remain subject to indemnification under this

34

Agreement.

C.    **Best Available Rate Program**

You must (i) make available through the Central Reservation System and the Chain website room rates equivalent to those offered to the general public by third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Available Rate Guarantee Program according to its published requirements. If a guest finds a lower publicly available rate on the Internet than the "Best Available Rate" you offer through the Chain website or the Central Reservation System for the same date and accommodations and the guest meets all Program requirements, you must provide the first room night to the guest without a room charge. You may collect standard incidental fees, charges and taxes. We will also charge you a Processing Fee of $60 to reimburse us for our administrative charges of handling the complaint.

D.    **Service Interruption Fee**

If we suspend Central Reservation System service because of your default under this Agreement, then you must pay us a Service Interruption Fee of $200 before we restore service.

E.    **GDS and Internet Booking Fees**

We will charge you under our Central Commission Payment Program either a GDS Fee or an Internet Booking Fee, as applicable, for reservations processed through the global distribution systems ("GDS") or the Internet for your Facility. GDS Fees are assessed for reservations processed through any GDS or through any Internet website powered by a GDS. Internet Booking Fees are assessed for any other Internet-originated reservations. We do not currently charge any fees for reservations booked through our Chain website or through our direct connection to on-line travel agents. If a guest cancels a GDS or Internet-originated reservation using the same source as was used to originate the reservation, you will not be charged the applicable fee. GDS and Internet-originated reservations may also incur travel agent and similar commissions. We will establish the amount of the GDS and Internet Booking Fees from time to time based on a weighted average of the fees these distribution channels charge us plus a reasonable processing charge.

F.    **Travel Agent Commissions and Other Distribution Charges**

Travel agent and other commissions are typically 10% of the *Gross Room Revenues* generated by each reservation booked by an agent or other qualifying originator, plus our service charge of .5% of commissionable revenue. Agencies which are part of a travel consortium or a travel management company may charge additional commissions and/or participation fees to be included in their programs. The general sales agent commission (also known as the international sales office commission) is 15% of the Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office and includes the agency commission. The "property to property" incentive sales commission is 10% of the Gross

35

Room Revenues generated from each reservation originated by another Chain Facility through the Central Reservation System, plus our service charge of .5% of commissionable revenue.

We or an affiliate may charge you a sales commission of up to 10% of the Gross Room Revenues generated from consumed reservations booked by members of affinity groups and organizations participating in our Member Benefits sales program. We or our affiliate usually pays a portion of this commission to the affinity group or organization in exchange for promoting the Member Benefits program to its members.

We will offer you the opportunity to participate in certain Internet distribution channel marketing and reservation activity with third parties. Under one type of arrangement, you will offer rooms for sale through an electronic distribution channel on which you will be paid a net, non-commissionable rate if and when the rooms are sold by the distribution channel at its marked-up rate. For providing and managing this activity we may receive commissions from the Internet distribution channels based upon the mark-up or room rates that they receive for renting your rooms. The net rate you receive, not the mark-up retained by the channel, should be included in Gross Room Revenues. We will allocate these commissions to Royalties and System Assessment Fees in equal proportions. Under another type of arrangement, you will offer rooms for sale through an electronic distribution channel at your best commissionable rate. The distribution channel will not mark-up these rates but will charge you a commission of up to 15% on consumed room nights.

We may change, modify or delete Additional Fees for existing services and programs and add new Additional Fees for new services and programs at any time upon not less than 30 days written notice.

36

## SCHEDULE D

## ADDENDUM FOR TRANSFER FACILITIES

This Addendum applies if you are the transferee of an existing Travelodge Facility.

1.    **TRANSFER AND ASSUMPTION:**

This transaction involves the transfer of an existing Chain Facility at the Location first granted to SHAZIA VENTURES, INC. ("Prior Franchisee") in a Franchise Agreement with us dated 12-JUL-2001 (the "Prior Agreement"). You assume and obligate yourself to perform any and all of the obligations (financial and otherwise) of the Prior Franchisee under the Prior Agreement that is not paid or performed as of the date of this Agreement, including without limitation, the obligation to pay any unpaid Royalties, System Assessment Fees or other amounts due us and to correct any uncured defaults other than as expressly superseded by this Agreement. You acknowledge that we may require you or your staff to complete training on the use of a property management or similar computer system for accessing the Reservation System and pay our retraining fee.

2.    **YOUR IMPROVEMENT OBLIGATION:**

2.1 **Improvements.** You must select and acquire the Location and acquire, equip and supply the Facility in accordance with System Standards for entering conversion facilities. You must begin improvement of the Facility no later than thirty (30) days after the Effective Date. You must thereafter continue renovation and improvement of the Facility as the Punch List requires and pass any related quality assurance inspection we may conduct. We may, in our discretion, require you to place funds in escrow, at your expense, in order to complete all necessary renovations. All improvements will comply with System Standards, any Approved Plans, Schedule B and any Punch List attached to this Agreement. Your general contractor or you must carry the insurance required under this Agreement during renovation. If you do not commence or complete the improvement of the Facility by the dates specified in this Section 2.1, or complete the post-transfer improvements specified in the Punch List after the Effective Date, then we may, in our sole discretion, terminate this Agreement by giving written notice to you. Time is of the essence for the Improvement Obligation. You must also pay us the Reinspection Fee described in Section 3.7 if you fail to complete any Improvement Obligation by the deadline established in the Punch List and our representatives must return to the Facility to inspect it. We may grant you one or more extensions of time to complete any phase or item on your Punch List in our sole discretion. The grant of an extension to perform your Improvement Obligation will not waive any other default existing at the time the extension is granted.

2.2 **Improvement Plans.** You will create plans and specifications for the work described in Section 2.1 of this Schedule D (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location. We will not unreasonably withhold or delay our approval, which is intended only to test compliance with

37

TRAEXCI
223765 Q1 08

System Standards, and not to detect errors or omission in the work of your architects, engineers, contractors or the like. Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements. We will not be liable to your lenders, contractors employees, guests, others or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction. Any material variation from the Approved Plans requires our prior written approval. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

2.3 **Opening**. You may continue to identify and operate the Facility under the System while you perform the Improvement Obligation, if any.

## 3. DEFINITIONS:

Effective Date means the date that you first take possession of the Facility, even if you sign this Agreement after the date you first take possession of the Facility.

Opening Date means the date as of which we authorize you to open the Facility for business identified by the Marks and using the Systems, even if you sign this Agreement after that date. Unless we require that you close the Facility to perform any pre-opening Improvement Obligation, the Opening Date is the Effective Date.

TRAEXC1
223765 Q1 08

### SCHEDULE D
### ADDENDUM FOR TRANSFER FACILITIES

**[Punch List Attached]**

TRAEXC1
223765 Q1 08

# GUARANTY

To induce TRAVELODGE HOTELS, INC., its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue, and Dispute Resolution and WAIVER OF JURY TRIAL applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

**GUARANTOR:**

Name:     Vinod Shah
Address:     6200 Savoy #550, Houston, TX 77036

40

TRAEXC1
223765 Q1 08

# EXHIBIT B

## AMENDMENT TO LICENSE AGREEMENT

THIS "AMENDMENT" is made and entered into as of this ____ day of ꓘ⎰⎳,
2010, ("Amendment Date") by and between **TRAVELODGE HOTELS, INC.,** a Delaware
corporation ("we", "us" or "our"), **VIPOO HOSPITALITY, INC.,** a Texas corporation ("you", or
"your"), and Vinod Shah (the "Guarantor"). This Amendment supplements that certain License
Agreement dated August 28, 2008 (the "License Agreement"), relating to a license to operate a
Travelodge® System Unit located at 910 Corn Products Road, Corpus Christi, TX 78409,
designated as Unit #9426-77467-03 (the "Facility"). To the extent of any conflict between the
License Agreement and this Amendment, the Amendment shall control.

IN CONSIDERATION of the mutual agreements herein contained, and promises herein expressed,
and for other good and valuable consideration, the receipt and sufficiency of which are
acknowledged by the parties, it is agreed as follows:

    1.    The License Agreement is amended by revising a portion of Schedule B, Part II,
The Facility to read as follows:

        Number of approved guest rooms:    240

    2.  <u>Confidentiality</u>. You acknowledge that the existence of this Amendment and the
granting of the benefits herein are strictly confidential between us and you. Part of the
consideration received by us for granting the benefits is your obligation to maintain
confidentiality about this Amendment and its benefits. Therefore, you agree not to disclose to
any person or entity the existence or subject matter of this Amendment, or the benefits granted
hereunder, except under compulsion of law or to attorneys or accountants as needed for
assistance with representation of or advice to you. Within your organization, information about
this Amendment will be disclosed to agents, officers, affiliates and contractors on a "need to
know" basis only. If you violate this confidentiality obligation, no further benefits will be
available from that time and thereafter, to the extent that the benefits have not then been fully
utilized upon written notice from us.

    3.  <u>Release</u>. You and Guarantor, on behalf of yourselves, your partners, officers, employees,
directors, shareholders, representatives, agents and your successors and assigns, hereby release and
hold harmless us, our officers, employees, agents, directors, shareholders, representatives, affiliates,
parent entities and subsidiaries (collectively, "Releasees") and the predecessors, successors and
assigns of the Releasees, from any and all claims and causes of action whatsoever arising prior to
and through the date of this Amendment relating to the offer, sale, administration, negotiation,
default, and/or performance of the License Agreement for the Facility.

    4.  Except as expressly stated in this Amendment, no further additions, modification or
deletions to the License Agreement or the Guaranty Agreement are intended by the parties or made
by this Amendment.

5.    <u>Execution in Counterparts</u>.  To facilitate execution of this Amendment by geographically separated parties, this Amendment, and all other agreements and documents to be executed in connection herewith may be executed in as many counterparts as may be required; and it shall not be necessary that the signatures on behalf of each party appear on each counterpart; but it shall be sufficient that the signature on behalf of each party appear on one or more of the counterparts.  All counterparts shall collectively constitute a single agreement.  It shall not be necessary in making proof of this Amendment to produce or account for more than a number of counterparts containing the respective signatures on behalf of all the parties hereto. All facsimile executions shall be treated as originals for all purposes.

Remainder of page intentionally left blank

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date indicated above:

**TRAVELODGE HOTELS, INC.**

By: _____

Valerie Capers Workman
Vice President


VIPOO HOSPITALITY, INC.


By: _____

(Vice) President


**GUARANTORS:**


By: _____

Vinod Shah


3

# EXHIBIT C

## GUARANTY

To induce TRAVELODGE HOTELS, INC., its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue, and Dispute Resolution and WAIVER OF JURY TRIAL applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.


**GUARANTOR:**

Name:        Vinod Shah
Address:     6200 Savoy #550, Houston, TX 77036

TRAEXC1
223765 Q1 08

# EXHIBIT D



**FORMAN HOLT ELIADES & YOUNGMAN** LLC

ATTORNEYS AT LAW

Constance N. DeSena
Associate
cdesena@formanlaw.com

www.formanlaw.com
REPLY TO PARAMUS

June 25, 2014

**Via Certified Mail/RRR & Overnight Mail**
Vipoo Hospitality, Inc.
910 Corn Products Road
Corpus Christi, Texas 78409
Attention: Pravin Surti

Re:     **NOTICE OF TERMINATION** of Franchise Agreement between Vipoo
Hospitality, Inc. and Travelodge Hotels, Inc. regarding 910 Corn Products Road,
Corpus Christi, Texas (the "Facility"); **DEMAND FOR DE-
IDENTIFICATION OF FACILITY and DEMAND FOR PAYMENT.**

Dear Mr. Surti:

This firm represents Travelodge Hotels, Inc. ("THI"). **THI hereby provides Vipoo
Hospitality, Inc. ("Vipoo Hospitality") with notice that the Franchise Agreement
between THI and Vipoo Hospitality, and all related agreements, are terminated
effective as of June 12, 2014 (the "Termination Date").** As used herein, the term
"Franchise Agreement" shall collectively mean: (i) the Franchise Agreement dated
August 28, 2008 between THI and Vipoo Hospitality; and (ii) all amendments to the
foregoing agreements and all agreements related thereto. Vinod Shah (the "Guarantor")
executed a Guaranty in favor of THI of all of the obligations of Vipoo Hospitality
under the Franchise Agreement.

On May 6, 2013, Vipoo Hospitality filed a voluntary chapter 11 bankruptcy petition
with the United States Bankruptcy Court for the Southern District of Texas (Case No.:
13-20208). On March 27, 2014, the bankruptcy court entered an Amended Order
Granting the Debtor's Emergency Motion (i) For Authority to Sell Substantially All
Property of the Estate Free and Clear of Liens and Other Interests; (ii) To Assume and
Assign Executory Contracts and Approve Cure Amounts; and (iii) for Order
Establishing Bid Procedures and Auction. (the "Order"). A copy of that Order is
enclosed. Paragraph 28(ii) of the entered Order provides as follows: "To the extent the
Franchise Agreement has not previously been rejected and/or terminated prior to
Closing, and absent separate agreement between the Buyer and THI or otherwise agreed
by THI, the Franchise Agreement shall be rejected by Debtor pursuant to 11 U.S.C.
§365(a) and terminated, effective as of Closing." Pursuant to the Notice of Sale Closing

| 80 Route 4 East, Suite 290 | 1700 Broadway, 41st Floor | 664 Chestnut Ridge Road | 1615 Jackson Street |
| Paramus, NJ 07652 | New York, NY 10019 | Spring Valley, NY 10977 | Philadelphia, PA 19145 |
| T 201.845.1000 | T 212.707.8500 | T 845.371.3451 | T 215.925.7191 |
| F 201.845.9112 | F 212.707.8511 | F 845.371.7667 | F 215.925.7192 |

00362990 - 1

Vipoo Hospitality, Inc.
June 25, 2014
Page 2

filed with the bankruptcy court at Docket No. 170, closing of sale occurred on June 12, 2014.

The foregoing does not constitute a waiver of any other additional grounds for termination that THI could have asserted under the terms of the Franchise Agreement.

Applicable law, paragraph 28 of the Order, and Section 13.1 of the Franchise Agreement provide that as of the Termination Date, Vipoo Hospitality is no longer authorized to use the "Travelodge Marks" or "Travelodge System" and that sale of the Facility does not confer upon the purchaser any rights to the THI Franchise Agreement or to otherwise use the protected intellectual property of THI. Applicable law, paragraph 28(iv) of the Order, and Section 13.2 of the Franchise Agreement further require Vipoo Hospitality to satisfy certain non-monetary post-termination obligations imposed under the Franchise Agreement and applicable law. Among other things, Vipoo Hospitality must: (i) remove all signage and other items bearing the Travelodge® Marks; (ii) perform all post-termination obligations specified in the Franchise Agreement, Systems Standards Manual and other applicable agreements; (iii) change all signs, billboards, and listings in telephone directories, travel guides, hotel indexes and similar materials in which the Facility is identified as a Travelodge® guest lodging facility; (iv) remove the Travelodge® Marks from any advertising or promotional activities on, around or directed towards the Facility, including any web sites, web pages or search engines; and (v) immediately return to THI all training documents, operating manuals, Confidential Information and other proprietary materials. Pursuant to paragraph 28(iv) of the Order, Vipoo was obligated to satisfy these post-termination obligations no later than three days prior to closing.

Vipoo Hospitality must immediately furnish evidence satisfactory to THI that it has satisfied its post termination non-monetary obligations under the Franchise Agreement and related agreements and must cooperate fully with THI regarding any post-termination inspections by THI.

Per THI's filed proof of claim in the bankruptcy proceeding, as of the date of Vipoo Hospitality's bankruptcy filing, Vipoo Hospitality was indebted to THI in the amount of $101,215.79 for recurring fees and other fees and charges due under the Franchise Agreement (the "Recurring Fees"). Vipoo Hospitality is also responsible for Recurring Fees which have accrued and remain unpaid from May 6, 2013 through the Termination Date, which total $18,199.45. Moreover, pursuant to Section 12.1 of the Franchise Agreement, Vipoo Hospitality is responsible to pay THI the sum of no less than $480,000 in liquidated damages. In addition, pursuant to Section 8.1 of the Franchise Agreement, Vipoo Hospitality is responsible for paying THI all attorneys' fees and costs incurred by THI in enforcing its rights under the Franchise Agreement and collecting the amounts thereunder.

Vipoo Hospitality, Inc.
June 25, 2014
Page 3

The Guarantor is liable to THI for at least the foregoing amounts and is not, to our understanding, personally involved in his own pending bankruptcy proceeding. Accordingly, demand is hereby made upon the Guarantor for payment of the forgoing sum of no less than $599,415.24. Payments should be made to "Travelodge Hotels, Inc." care of Forman, Holt, Eliades & Youngman, LLC, 80 Route 4 East, Paramus, NJ 07652, Attention: Daniel M. Eliades, Esq. **Time is of the essence.**

Nothing in this notice should be deemed to constitute a demand for payment upon Vipoo Hospitality due its pending bankruptcy proceeding. THI reserves the right to continue to seek payment from the Vipoo Hospitality in its bankruptcy proceedings. The rights of THI to prosecute a proof of claim, administrative claim, rejection/termination claim, and/or any other claim against Vipoo Hospitality in the bankruptcy proceeding is expressly preserved.

Nothing in this notice shall be deemed to waive THI's rights to collect monetary damages or seek other non-monetary relief; nor shall it waive any other rights and/or remedies THI may possess. This notice does not modify, replace or affect any existing default or termination notices, if any, from THI regarding the Facility or Franchise Agreement. Moreover, this letter is without prejudice to or waiver of any of THI's rights and without constituting an admission that there are no other monetary or non-monetary obligations due and owing to THI concerning the Franchise Agreement. THI reserves all additional rights and remedies under the Franchise Agreement, at equity or law.

If you have any questions concerning your post-termination obligations, please contact me at (201) 845-1000.

Very truly yours,

Constance N. DeSena

Constance N. DeSena
CND/dmm
cc:    Duane Brescia, Esq. (Counsel for Debtor) (Via E-Mail & First Class Mail)
       Vinod Shah (Guarantor) (Via Overnight Mail) (910 Corn Products Road, Corpus Christi, Texas)